# In the United States Court of Federal Claims

No. 15-1570C

(E-Filed: September 14, 2016)

| | |
|---|---|
| OMRAN HOLDING GROUP, | ) |
| | ) |
| | ) Pre-Award Bid Protest; Motion to |
| Plaintiff, | ) Dismiss for Lack of Jurisdiction; |
| | ) Standing; RCFC 12(b)(1); |
| v. | ) Substantial Chance Test. |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

Dirk Haire, Washington, D.C., for plaintiff.

P. Davis Oliver, Trial Attorney, with whom were Benjamin C. Mizer, Principal Deputy Assistant Attorney General; Robert E. Kirschman, Jr., Director; and Douglas E. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. Regina Schowalter, District Counsel for the USACE Transatlantic Afghanistan District, of counsel.

OPINION AND ORDER[1]

CAMPBELL-SMITH, Chief Judge

       This is a pre-award bid protest. The procuring agency is the United States Army Corps of Engineers, Transatlantic Afghanistan District (Government, agency, USACE, or defendant). Omran Holding Group is an unsuccessful offeror (Omran, OHG, or

---

[1]     This Opinion was issued under seal on August 18, 2016. The parties were given the opportunity to request redactions, however none were requested. The original Opinion is hereby unsealed and reissued without redaction.

plaintiff). Defendant issued a solicitation for the construction of various structures at Karzai International Airport in Kabul, Afghanistan.

Defendant found that Omran's proposal was nonresponsive, and accordingly, did not evaluate it. Specifically, defendant found that Omran failed to satisfy the solicitation requirement that it maintain "installation access,"[2] defined as authorization to access U.S. military installations. Defendant determined that Omran lacked the requisite installation access after checking the Joint Contingency Contracting System (JCCS), a vendor vetting database.

Omran seeks a permanent injunction declaring that the revocation of Omran's installation access was arbitrary, capricious, and not in accordance with law, and that the revocation decision is null, void, and unenforceable. Further, Omran asks this court to require defendant to change its status in the JCCS database to "approved," and to enjoin defendant from finding its proposal to be nonresponsive.

Defendant filed a motion to dismiss Omran's complaint for lack of jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), arguing that Omran cannot demonstrate prejudice and thus it lacks standing to bring this bid protest. In the alternative, defendant seeks dismissal of Omran's complaint under Rule 12(b)(6), arguing that plaintiff's claims are nonjusticiable, and thus fail to state a claim upon which relief can be granted.

Defendant's motion is fully briefed and ripe for decision. The court did not hear oral argument.

For the reasons explained below, the court **GRANTS** defendant's motion to dismiss for lack of jurisdiction, and **DENIES AS MOOT** defendant's motion to dismiss for failure to state a claim upon which relief can be granted.

---

[2]   The terms "installation access" and "base access" are interchangeable.

I.    Background

    A.    Solicitation

On November 13, 2015, defendant issued solicitation number W5J9JE-16-R-0005 for a "Force Protection Upgrade project at Hamid Karzai International Airport . . . Kabul, Afghanistan, in support of the Afghan Air Force and Afghan Special Mission Wing . . . missions." La Rosa Decl.[3] ¶¶ 2-3; A6.[4] The project involved the construction of various structures and facilities to improve the security of the airport perimeter. A4-A5.

The procurement was conducted on a "lowest priced technically acceptable" basis. A21. The Technical Proposal included three factors, Experience, Past Performance, and Key Personnel. A26. "To be considered technically acceptable, no technical factor in the proposal may be rated as 'Unacceptable.' The failure of a proposal to meet all of the requirements under any Factor will result in a technically unacceptable rating and preclude award." A40.

The solicitation provided that award would be made to the one offeror whose proposal conformed to the solicitation requirements, was evaluated as technically acceptable, provided the lowest evaluated price, and who the contracting officer deemed responsible. A40.

---

[3]    Declaration of Ralph J. La Rosa, Mar. 28, 2016, ECF No. 37-1 (sealed), at A1-A3. (La Rosa decl.). Mr. La Rosa is the Senior Contracting Officer for the U.S. Army Corps of Engineers, Transatlantic Afghanistan District. La Rosa decl. ¶ 1. Mr. La Rosa declares that he has been an acquisition professional for thirty-nine years. La Rosa decl. ¶ 1.

[4]    Defendant filed an appendix of documents with its motion to dismiss. See Appendix, ECF No. 37-1 (sealed). These documents included pre-solicitation materials (A4-A8), the solicitation (A9-A98), relevant military memoranda (A99-A106), and pricing sheets ranking offerors on the basis of the proposed price of their proposal (A112-A123). Defendant also filed a separate classified annex to its motion to dismiss. ECF No. 36 (Notice of Filing). Review of defendant's classified annex shows that it pertains only to defendant's Rule 12(b)(6) argument that Omran's claims are nonjusticiable, and not to its Rule 12(b)(1) argument that Omran lacks standing. The court considered no classified material in the preparation of this opinion.

Solicitation requirements included compliance with clause 5152.225-5916 and several required registrations.

        1.        Clause 5152.225-5916 – Mandatory Eligibility for Installation Access

Clause 5152.225-5916—Mandatory Eligibility for Installation Access (OCT 2015)— was incorporated in the solicitation by full text.  A89-A90; La Rosa decl. ¶ 7. As relevant to this matter, clause 5152.225-5916 is included below:

> (a) U.S. and Coalition Commanders possess inherent authority to maintain law and order, provide security, and impose discipline necessary to protect the inhabitants of U.S. and/or Coalition installations, U.S. and Coalition personnel operating outside of installations, and U.S. or Coalition-funded developmental projects in Afghanistan.  <u>This authority allows commanders to administratively and physically control access to installations and/or project sites, and to bar contractors – including prime contractors, subcontractors at any tier, and any employees, from an installation or site</u>.  A commander's inherent force protection (FP) authority is independent of an agency's contracting authority, and it may not be superseded by any contractual term or provision.
>
> (b) The prime Contractor/Vendor acknowledges that: submission of a bid, offer, or a proposal. . . requires that the prime Contractor/Vendor . . . remain eligible during the entire period of contract performance to include any warrant period – for installation access to a U.S. and/or Coalition installation, regardless of whether the performance will take place on or off a U.S. or Coalition installation.
>
> (c) To be eligible for installation access, Contractors . . . are required to register for installation access in the Joint Contingency Contracting System (JCCS) and are responsible for keeping the information in this system updated at all times. . . . The offeror must be registered, approved, and eligible for installation access prior to award, and remain eligible for installation access for the life of the contract.

. . . .

> (2) Failure to be approved in JCCS -- and thereby be eligible for installation access . . . , may render the offeror/contractor ineligible for award or continued performance. Additionally, any firm that is declared ineligible for installation access will be deemed non-responsible until such time as that firm is again deemed eligible by the appropriate access approval authority.
>
> (d) <u>Installation access determinations arise from the Combatant Commander's inherent authority</u> and are separate and distinct from any law, regulation, or policy regarding suspension and debarment authority. Contractor queries or requests for reconsideration related to U.S. or Coalition installation base access eligibility must be directed to the authority responsible for base access decisions.

A89-A90 (clause 5152.225-5916) (emphasis added).

Mr. La Rosa declared that in its contracting efforts, the USACE is required to comply with the direction provided in two memoranda issued by United States Central Command (USCENTCOM or CENTCOM) Joint Theater Support Contracting Command (C-JTSCC) in Afghanistan and Department of Defense (DoD) Acquisition, Technology and Logistics. La Rosa decl. ¶¶ 7-9 (citing La Rosa decl. Exs. 4-5, A99-A106).

On November 27, 2014, the CENTCOM[5] Joint Theater Support Contracting Command issued a memorandum to "All DoD Heads of Contracting Activities." La Rosa decl. Ex. 5, A103-A106. This memo was signed by Head of Contracting Activity, U.S. Air Force Brigadier General Brett J. McMullen, A106, and directed, <u>inter alia</u>, that "[a]ll contracting organizations, regardless of any command relationship with USCENTCOM, awarding contracts with performance or delivery in Afghanistan shall coordinate with C-JTSCC through the [Theater Business Clearance (TBC)] process," A103 ¶ 3.

---

[5] U.S. Central Command is a combatant command in the U.S. Department of Defense responsible for military operations in twenty countries—including Afghanistan—falling within the "central" area of the globe (Middle East, Central Asia and South Asia). U.S. Central Command, http://www.centcom.mil/about-us/component-commands (last visited Aug. 18, 2016); U.S. Dep't of Defense, http://www.defense.gov/Sites/Unified-Combatant-Commands (last visited Aug. 18, 2016).

Mr. La Rosa declared that the most recent direction on "TBC process" was issued in December 2015 by the Expeditionary Contracting Command – Afghanistan, and distributed under a memorandum from DoD Acquisition, Technology and Logistics— "Contracting Officers' Guide for Theater Business Clearance (TBC) Afghanistan" ("Contracting Officers' Guide"). La Rosa decl. ¶ 9; La Rosa decl. Ex. 4, A99-101. As specified on the face of the Contracting Officers' Guide, "TBC requirements are generated from Battlefield Commander Orders and apply to contractors in the battle space." A99. The Contracting Officers' Guide directs that a contracting agency is required to insert clause 5152.225-5916 "ONLY in solicitations/resultant contracts **where award will be made to a host nation (Afghanistan) vendor**." A100; see also La Rosa decl. ¶ 10.

According to the solicitation, "[t]his solicitation limits competition to . . . sources from Afghanistan." A9. Omran is an Afghan construction and engineering firm providing government contracting services in Afghanistan. Compl. ¶ 1.

### 2. Required Registrations

The "Instructions to Offerors" included in the solicitation also included a list of "Required Registrations," which expressly included those registrations required by clause 5152.225-5916:

> Joint Contingency Contracting System (JCCS): Offerors must be registered in the JCCS vendor vetting database at https://www.jccs.gov/olvr/.
>
> Contractor must be able to access US Military Installations during the entire performance of the contract – regardless if the project i[s] on a US Military Installations or not.

A22.

### B.   Defendant's Evaluation of Proposals

Proposals were due by December 4, 2015.[6] A9. The agency received a total of 131 proposals in response to its solicitation. La Rosa Decl. ¶ 14. Of those 131 proposals,

---

[6]   Although the solicitation states that proposals were due by December 4, 2015, A9, Mr. La Rosa declares they were due by December 5, 2015, La Rosa decl. ¶ 13. The difference is irrelevant to this decision.

7 proposals were submitted after the due date, and the agency accordingly did not evaluate them. Id. ¶ 13. In addition, another 97 proposals were submitted by offerors who were found to be base access ineligible, and for that reason, the agency removed those offerors from the competition. Id. ¶ 14.

The Source Selection Evaluation Board (SSEB) reviewed the remaining 27 responsive proposals, of which it found 23 to be technically acceptable.[7] Id. ¶¶ 14, 16.

Mr. La Rosa explained how he determined whether an offeror was installation access eligible.

> 22. I play no role in the decision as to whether an offeror is installation access eligible or ineligible.
>
> 23. To determine if an offeror is eligible for installation access, and therefore eligible for an award, I log into the JCCS system, search for the vendor, review the information, and make my determination off information presented in the system.
>
> 24. The determination to deny an entity access to an installation is a matter of inherent commander authority.
>
> 25. Neither I, nor USACE, manages the JCCS system; I use it merely as an interface for information on offeror installation access eligibility.

La Rosa decl. ¶¶ 22-25.

---

[7] There is some contradiction in the record as to whether there were 22 or 23 technically acceptable proposals. Mr. La Rosa declares that there were 23 technically acceptable proposals. La Rosa decl. ¶ 14. In its appendix, however, defendant included two pricing sheets listing offerors by name, ranked from low to high on their proposed price. It is clear from the first pricing sheet that 131 offerors submitted proposals. See A112-A116. The second pricing sheet lists 23 offerors by name, together with a notation as to whether their "overall technical rating" was acceptable or not. Twenty-two offerors were listed as having an "acceptable" technical rating, while 1 offeror, Omran, was listed as "Not evaluated." A122-A123. This suggests that there were 22 technically acceptable proposals, not 23. The difference, however, is irrelevant to this decision.

The agency found Omran to be installation access ineligible, and thus it deemed Omran's proposal nonresponsive. Id. ¶ 15. Because its proposal was deemed nonresponsive, the SSEB did not evaluate Omran's technical proposal. Id. ¶ 16.

The proposed price for all 131 proposals ranged from $799,500 to $5,765,000. A112-A116. For only the responsive, technically acceptable proposals, the proposed price ranged from $1,202,939 to $5,765,000. A122-A123.

Omran's proposal was priced at $3,567,490. La Rosa decl. ¶ 18. When ranked from low to high with the responsive, technically acceptable proposals, Omran's proposal ranked at number 19 out of 23 proposals. La Rosa decl. ¶ 19; A123. Put another way, 18 proposals were responsive, technically acceptable, and lower cost than Omran's proposal.

During a telephonic status conference held on January 15, 2016, defendant's counsel reported the agency had completed its technical evaluation and identified the selectee. Order 3, Jan. 15, 2016, ECF No. 19 (sealed). Plaintiff did not request a stay of the award, nor had it filed a motion for a temporary restraining order. On January 20, 2016, the agency awarded the contract to Keraman Construction Company. La Rosa decl. ¶ 20.

Keraman Construction Company had a proposed price of $1,202,939, which was $2,364,551 less than Omran's price. See id.; A122-A123.

C.    Omran's Complaint

On December 23, 2015, Omran filed its complaint in this court in which it asserted five claims. Compl., ECF No. 1. Omran's claims all stem from the decision to revoke its installation access, and the agency's resulting finding that its proposal was nonresponsive.[8]

---

[8]    Omran provides a detailed description of its previous contracting history with defendant, in support of its claims that the decision to revoke its installation access was made in an attempt to exclude Omran from government contracting. See Compl. ¶¶ 5-41. As the Court does not reach the merits of Omran's claims, it is unnecessary to consider the parties' previous history, and any role that history may have played in the events about which Omran now complains.

In Count I, Omran alleges that defendant's decision to find Omran ineligible for award based on its lack of installation access "constitutes a de facto debarment" and that in reaching that decision defendant failed to comply with the FAR[9] Subpart 9.4 procedures for debarment.  Compl. ¶¶ 42-58.  In Count II, Omran alleges that defendant's decision to revoke Omran's "installation access without notice or an opportunity to be heard" denied Omran its Fifth Amendment due process rights.  Id. ¶¶ 59-75.  In Count III, Omran alleges that in finding it "ineligible for installation access (and therefore, automatically non-responsible under the CENTCOM Clause[10]) . . . Defendant's decision fails to comply with FAR Subpart 9.1" which provides procedures for determining whether a prospective contractor is responsible.  Id.  ¶¶ 76-91 (footnote added).  In Count IV, Omran alleges that the government acted in bad faith in "finding [Omran] to be ineligible for installation access, ineligible [for] award, non-responsible, and in violation of the CENTCOM Clause."  Id. ¶¶ 92-100.  Finally, in Count V,[11] Omran alleges that for the reasons discussed in its previous four counts, the government breached its implied-in-fact contract of good faith and fair dealing.  Id. ¶¶ 101-103.  For all these reasons, Omran asserts that defendant's behavior was arbitrary, capricious, and contrary to law.  Id. ¶¶ 43, 60, 77 & 93.

Omran requests sixteen different types of relief.  Id. at 30-32 (Prayer for Relief).  Review of Omran's requests for relief show that they primarily ask this court to declare that the decision finding Omran "ineligible for installation access (and therefore, non-responsible and non-responsive)" is arbitrary and capricious, and that the court declare that decision null, void and unenforceable.  Id. at 30-31 ¶¶ a, c, e-f.  Omran also asks that the court "[r]equire that Defendant reinstate [its] 'approved' status in JCCS," id. at 31 ¶ d, and that the court "[e]njoin Defendant from finding [its] proposal . . . non-responsive," id. at 30-31 ¶¶ b, i-j, and that the court enjoin defendant from finding Omran to be not responsible, id. at 30-31 ¶¶ b, g-h.  Finally, Omran asks the court to ensure that defendant refrains from causing Omran future harm, id. at 32 ¶¶ k, l, to provide other relief as necessary, including injunctive relief, id. at 32 ¶¶ m, n & p, and to grant Omran its bid and proposal costs, id. at 32 ¶ o.

---

[9]      Federal Acquisition Regulations, 48 C.F.R. pts. 1-53 (2015).

[10]     Omran refers to clause 5251.225-5916 as the CENTCOM Clause.  Compl. 1.

[11]     Omran misnumbered the fifth Count as Count VI.

9

D.     Defendant's Motion to Dismiss

In lieu of an answer, defendant filed a motion to dismiss under both Rules 12(b)(1) and 12(b)(6). Def.'s Mot., Mar. 28, 2016, ECF No. 37 (sealed). Defendant first argues that Omran lacks standing in this bid protest as it cannot show prejudice. Id. at 6-8. Because Omran's proposed price—in this lowest price technically acceptable procurement—"places it at 19 of 23 offerors," argues defendant, Omran is unable to show that it would have had a substantial chance to receive the contract. Id. at 8.

Alternatively, defendant argues that Omran's claims are nonjusticiable, and therefore must be dismissed for failure to state a claim upon which relief can be granted. Id. at 8-15. Defendant asserts that Omran's claims are all based on the decision to deny it installation access, a decision made by the Task Force 2010, a Directorate within U.S. Army Central Command. Id. at 9 & n.7 (citing Declaration of Jason G. Riley, Feb. 6, 2016, ECF No. 29-1 (Riley decl.) (sealed)). Jason Riley is a Colonel in the U.S. Army, and the Director of Task Force 2010. Riley decl. ¶ 1. Colonel Riley described the vendor vetting process, in which he was responsible for "vetting vendors contracted to do business in Afghanistan with US or Coalition Forces." Id. ¶ 3. "A vendor's installation access is denied when it has been determined that the vendor's access to any installation in Afghanistan poses a high force protection risk to United States or Coalition Forces." Id. According to Colonel Riley, "Omran was entered into the JCCS as Base Access Ineligible on October 27, 2015 . . . ." Id. ¶ 4. Defendant emphasizes that the USACE, including the contracting officer in this procurement, plays no role in installation access decisions, nor does it manage the information in the JCCS database. See Def.'s Mot. 9-10; see also La Rosa decl. ¶¶ 22-25.

Defendant argues that "[e]ven where a court possesses jurisdiction to hear a claim, it may not do so in cases where the claim presents a nonjusticiable controversy – i.e., the claim is such that the court lacks 'ability to supply relief.'" Def.'s Mot. 8-9 (quoting Adkins v. United States, 68 F.3d 1317, 1323 (Fed. Cir. 1995)). In this matter, Omran challenges the military combatant commander's decision to deny it installation access, the adjudication of which would require "a judicial determination on the merits of the installation access decision." Id. at 10. Such a decision, argues defendant, is nonjusticiable. Id. at 10-11 (citing, inter alia, Egan v. Dep't of the Navy, 484 U.S. 518, 529 (1988); Kaplan v. Conyers, 733 F.3d 1148, 1156 (Fed. Cir. 2013)).

Plaintiff filed its opposition on April 14, 2016, in which it asserts it has standing in this matter, and that its claims are justiciable. Pl.'s Opp'n, ECF No. 38 (sealed). Defendant filed it reply on April 25, 2016. Def.'s Reply, ECF No. 39 (sealed).

II.     Legal Standard

The Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to . . . the award of a contract . . . in connection with a procurement." 28 U.S.C. § 1491(b)(1) (2012). Within the meaning of the Tucker Act, the term "interested party" limits standing to an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). "[T]o establish a direct economic interest in the procurement, a protester must demonstrate prejudice." Bos. Harbor Dev. Partners, LLC v. United States, 103 Fed. Cl. 499, 503 (2012) (citing Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("prejudice (or injury) is a necessary element of standing")).

"In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). "In establishing the predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings . . . ." Cedars–Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993).

"[P]laintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence." Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013).

A.      Substantial Chance Test

"To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process. In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citation omitted).

Courts interpreting the substantial chance standard for standing have held that it requires a showing of "likelihood of prevailing on the prospective bid taking the protestor's allegations as true." Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 355 n.5 (2013) (quoting McKing Consulting Corp. v. United States, 78 Fed. Cl. 715, 721 (2007)).

11

B.     Standing for an Actual Offeror in a Pre-Award Protest

This court has found that "[t]he posture of a protest determines the evidentiary showing necessary to establish a 'direct economic interest.'" Miles Constr., LLC v. United States, 108 Fed. Cl. 792, 797-98 (2013). As explained by the court in Miles Construction,

> Generally, to prove the existence of a direct economic interest, a party must show that it had a "substantial chance" of winning the contract. An exception to that standard is when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid. In that circumstance, the protestor can establish standing by demonstrating that it suffered a "non-trivial competitive injury which can be redressed by judicial relief."

Miles Constr., 108 Fed. Cl. at 797-98 (quoting Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361-62 (Fed. Cir. 2009).

In Weeks Marine, the Federal Circuit established an exception to the substantial chance standard in the case of a pre-bid, pre-award protest. Weeks Marine, 575 F.3d at 1359-63. In such a protest, the Federal Circuit held that when a prospective offeror challenges a solicitation in the pre-award context, it demonstrates a direct economic interest by showing it suffered a "non-trivial competitive injury which can be redressed by judicial relief." Weeks Marine, 575 F.3d at 1361-62.

In contrast, in Orion Technology the Federal Circuit stated that in a pre-award protest in which the protestor was an actual offeror, the determination of whether the substantial chance or non-trivial competitive injury test governs turns on whether there is an "adequate factual predicate to ascertain under the traditional 'substantial chance' standard whether [the protestor] was prejudiced by the [agency's] decision." Orion Tech., 704 F.3d at 1349. The court in Orion Technology considered whether there was an adequate factual predicate in a case in which the agency did not evaluate the protestor's proposal because the protestor failed to comply with the solicitation requirement that it provide cost information for every subcontractor. Orion Tech., 704 F.3d at 1348. The Federal Circuit found that on the facts of Orion Technology, substantial chance was the correct test in that pre-award protest.

Here, Orion is not challenging the terms of the solicitation, as was the case in Weeks Marine; it is challenging the Army's application of those

12

> solicitation criteria to Orion. The Army evaluated Orion's bid for compliance with the terms of the solicitation and then gave detailed reasons for rejecting Orion's proposal. In addition, Orion's bid was within the competitive range later established by the Army after Orion's exclusion but before the Army's initial response to Orion's first GAO protest. Given the circumstances, there is an adequate factual predicate to ascertain under the traditional "substantial chance" standard whether Orion was prejudiced by the Army's decision to exclude its initial proposal.

Orion Tech., 704 F.3d at 1349; see also Draken Int'l, Inc. v. United States, 120 Fed. Cl. 383, 392 (2015) ("[W]here bids have been submitted but an award has not been made, the correct test of economic interest is the 'substantial chance' test used in the post-award context, not the 'non-trivial competitive injury' test." (citing Orion Tech., 704 F.3d at 1348)); Bailey Tool & Mfg. Co. v. United States, 117 Fed. Cl. 457, 462 (2014) (applying substantial chance test in a pre-award protest in which the protestor was an actual offeror excluded from competition); Miles Constr., 108 Fed. Cl. at 798 (same).

III. Discussion

The court now considers when resolicitation is necessarily the remedy and the legal test for standing in such a protest, whether resolicitation would necessarily be the remedy for any of Omran's claims, and finally, whether Omran has standing in this bid protest.

    A.    Parties' Rule 12(b)(1) Standing Arguments

Defendant argues that plaintiff's complaint must be dismissed for lack of standing, as Omran cannot show that it would have had a substantial chance of receiving the contract, due to the comparatively high price of its proposal. Def.'s Mot. 6-8.

> Omran cannot show that it has a "likelihood of prevailing on the prospective bid" assuming its allegations are true because its price quote is significantly higher than Omran's competitors. . . . Omran's price, when compared to only those technically acceptable, installation-access eligible offerors, places it at 19 of 23 offerors. [A3] . . . To prevail despite that steep price differential, Omran "would have to challenge the bona fides of the 18 offerors who submitted lower, technically acceptable offers, "or the solicitation as a whole." [Universal Marine Co., K.S.C. v. United States, 120 Fed. Cl. 240, 248 (2015)]. Omran, however, has not challenged the solicitation, nor is

13

>there any basis to believe that all 18 offerors who submitted lower prices than Omran are ineligible for award.

Id. at 8.

Omran does not dispute that had the agency evaluated its proposal, and found it technically acceptable, its price would have placed it behind eighteen lower-cost offerors. In Omran's view, however, the correct legal inquiry is not whether it would have had a substantial chance to receive the contract in the current procurement. Rather,

> [b]ecause OHG was excluded from the competition, the primary inquiry is whether or not the Government would need to re-solicit the contract and allow OHG to compete, if OHG prevails on its bid protest. Chenega [Mgmt., LLC v. United States, 96 Fed. Cl. 556, 571 (2010)]. Here, should OHG prevail on its protest challenging its exclusion, the Government would be required to re-solicit the work and allow OHG to compete. See id. Therefore, OHG [h]as a direct economic interest and substantial chance of receiving the contract award. See id.

Pl.'s Opp'n 12. This paragraph is the entirety of Omran's argument in support of its claim to standing.

Defendant replies that assuming the government was required to resolicit the contract, Omran has misstated the standard for standing. Def.'s Reply 3. In defendant's view, if resolicitation were the remedy, Omran would still have to show that it had a substantial chance to receive the contract in this procurement. Id. at 3-4 (citing U.S. Sec. Assocs., Inc. v. United States, 124 Fed. Cl. 433, 436 (2015) (opinion granting defendant's motion to dismiss complaint for lack of jurisdiction)).

Although Omran recognizes that the "primary inquiry" in determining standing is "whether or not" the agency would be required to resolicit the contract, it makes no argument that resolicitation would necessarily be the remedy in this case. Pl.'s Opp'n 12. Instead, Omran simply assumes that defendant would be "required to re-solicit the work," if it prevailed in its protest. Id. Defendant likewise failed to consider whether resolicitation would be the remedy in this case, arguing only that Omran misstated the legal test for standing in such a protest. See Def.'s Reply 3-4.

14

B.   Resolicitation Cases

The Federal Circuit has provided clear guidance on both the circumstances in which a successful protest would require the agency to resolicit the procurement, and the test for standing in such a protest.  See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1359-60 (Fed. Cir. 2015); Comint Sys. Corp. & EyeIT.com, Inc., Joint Venture v. United States, 700 F.3d 1377, 1382 n.4 (Fed. Cir. 2012); CACI, Inc.–Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983); Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 571-72 (2010).

1.   Test for Standing in a Resolicitation Case

The Federal Circuit has stated that in a resolicitation case, the test for standing is whether the protestor would be eligible to compete in the resolicitation, not whether it would have had a substantial chance under the current solicitation.  See Impresa, 238 F.3d at 1334.

> [I]f [Impresa's] bid protest were allowed . . . , the government would be obligated to rebid the contract, and appellant could compete for the contract once again. Under these circumstances, the appellant has a "substantial chance" of receiving the award and an economic interest and has standing to challenge the award.

Id.; see also Tinton Falls, 800 F.3d at 1360 ("To establish prejudice, Tinton Falls need not show it would win the contract in competition with other hypothetical bidders [in a resolicitation].  Rather, all a protester must establish to demonstrate prejudice is that it has a substantial chance of receiving the contract—that it is a qualified bidder and could compete for the contract.") (internal citation omitted); Comint Sys., 700 F.3d at 1382 n.4 ("[T]he standing question with respect to a claim that the agency had an obligation to rebid the contract turns on whether the bidder had a substantial chance of securing the award on the rebid, not on whether it had a substantial chance of securing the award under the original solicitation." (citing Impresa, 238 F.3d at 1334)).

Defendant's reliance on U.S. Security Associates is misplaced, as that was not a resolicitation case.  In U.S. Security Associates, the protestor challenged the agency's evaluation of the awardee's proposal in a lowest price technically acceptable procurement.  See U.S. Sec. Assocs., Inc. v. United States, 123 Fed. Cl. 663, 665-66 (2015) (order denying plaintiff's motion for preliminary injunction).  Had the protestor

15

prevailed and the agency been required to set aside the award to the awardee, the agency would simply have turned to the next lowest price proposal; resolicitation would have been unnecessary. See id. at 665 (stating that the agency received quotations from the awardee, the protestor, and an unspecified number of other entities).  That the court in U.S. Security Associates determined the protestor's standing by evaluating whether it had a substantial chance to receive the contract in the current procurement lends no support to defendant's argument that this is the test for standing in a resolicitation case.

If resolicitation was necessarily the appropriate remedy in this case, Omran would demonstrate standing by showing that it was a qualified bidder and could compete for the contract in a resolicitation.  See Impresa, 238 F.3d at 1334; see also Tinton Falls, 800 F.3d at 1360; Comint Sys., 700 F.3d at 1382 n.4.

2.  When Resolicitation is Required

Review of the relevant caselaw shows there are two situations in which a successful protest will necessarily require the agency to resolicit the procurement.  In the first situation, the protestor's allegations involve illegality that pervaded the source selection process, such that the integrity of the procurement process is called into question.  See Chenega Mgmt., 96 Fed. Cl. at 571; see also CACI, 719 F.2d at 1575.

In Chenega Management, the agency included two proposals in the competitive range, those submitted by DRG and Offeror 3.  Chenega Mgmt., 96 Fed. Cl. at 564.  Chenega Management alleged that Offeror 3 provided a gratuity—Super Bowl tickets—to an agency procurement official with the power to influence the contract award decision.  Id. at 566.  Based on this allegation, Chenega Management claimed that the "source selection process was tainted by the alleged gratuity and [the resulting] unlawful bias," id. at 571, and it "challenged [both] the evaluation process that resulted in its exclusion from the competitive range, as well as the ultimate award" to the awardee, id. at 572.

The court found that the allegations of bias and illegal gratuities, "if established, necessarily would require the [agency] to re-solicit the Contract, and afford Plaintiff the opportunity to compete again." Id. (citing CACI, 719 F.2d at 1575).

In CACI, the protestor's allegations centered on relationships between the awardee's vice president and four members of the agency's Technical Evaluation Board (TEB).  See CACI, 719 F.2d at 1570-71.  The awardee's vice-president was a former agency employee, and the four TEB members were his former colleagues, with whom he

16

had either prior professional or social relationships.  Id.  The four TEB members clearly had the power to influence the award of the contract, and CACI alleged that their relationships with the awardee's vice-president resulted in impropriety in the bid evaluation process benefitting the awardee.  The Federal Circuit agreed with the trial court that should CACI prevail in its protest, the agency would necessarily have been required to repeat the bidding process.  Id. at 1575.

> The injury CACI here asserts is that the government's breach of its implied contract to deal fairly with all bidders denied CACI the opportunity to have its bid considered solely on its merits.  An injunction barring the award would correct this alleged injury since it would require the government, <u>if it wants to go ahead with the procurement, to repeat the bidding process under circumstances that would eliminate the alleged taint of the prior proceedings</u>.

Id. at 1575 (emphasis added).

The second situation in which resolicitation would be the required remedy is when the awardee was the only acceptable offeror in the procurement, such that if the court set aside the award, there would be no other remaining offeror to which the agency could turn.  Lacking other acceptable offerors, the agency would have no choice but to resolicit the procurement.  See, e.g., Tinton Falls, 800 F.3d at 1356, 1359 (finding an unsuccessful offeror had standing to challenge the award to the awardee, the only technically acceptable small business in the small business set-aside procurement); Impresa, 238 F.3d at 1334 (finding an unsuccessful offeror had standing to challenge the responsibility decision of the awardee, the only technically acceptable offeror in the procurement).

In this case, Omran neither challenged the award to Keraman Construction Company, nor was Keraman Construction Company the only qualified offeror in the procurement.  The agency received a total of twenty-two technically acceptable proposals, any one of which it could have accepted in this lowest price technically acceptable procurement.  See La Rosa decl. ¶ 14; see also supra part I.B.  Omran did not mention this situation in its assertion of standing and it is clearly inapplicable under the facts of this case.

      C.      Remedies for Omran's Claims

Omran relies solely on Chenega Management in its assertion that resolicitation is the required remedy in this case.  See Pl.'s Opp'n 12.  The court infers from this reliance

17

that Omran views its case to be like that in Chenega Management.

As previously discussed, the protestor in Chenega Management challenged the entire source selection process, alleging that it was infused with "bias" towards one offeror and "tainted" by the unlawful gratuity alleged to have been provided by that offeror to an agency procurement official. Chenega Mgmt., 96 Fed. Cl. at 571-72; see also supra part III.B.2. Similarly, in CACI, the decision on which the Chenega Management court relied, the protestor alleged behavior between agency procurement officials and the awardee that if proven "resulted in prejudice in favor of [the awardee] and against other firms seeking the contract." CACI, 719 F.2d at 1569; see also supra part III.B.2.

Omran makes no such allegations in this protest. Omran has not alleged bias in favor of the awardee or any other offeror; nor has it alleged that there was any error in the evaluation of any other offeror's proposal. Nor has Omran alleged that the overall source selection process was rendered unfair, due to agency behavior. As defendant correctly points out, "Omran . . . has not challenged the solicitation, nor is there any basis to believe that all 18 offerors who submitted lower prices than Omran are ineligible for award." Def.'s Mot. 8.

Rather, in each of Omran's five counts, it challenges the combatant commander's decision to deny it installation access, and the resulting decision by the USACE that its proposal was nonresponsive. See supra part I.B. Omran's case is not like either Chenega Management or CACI, and the allegations for which each court found that resolicitation was required—a procurement tainted with illegality, bias, or prejudice towards one offeror—are all absent from this case.

The court notes that in its lengthy Prayer for Relief, Omran did not seek resolicitation as a remedy. See Compl. 30-32; see also supra part I.C. Rather, Omran sought to have the decision that it was ineligible for installation access declared void, Compl. 30-31 ¶¶ a, c, e-f, that the court direct that Omran be reinstated as "approved" in the JCCS, id. at 31 ¶ d, that the court enjoin defendant from finding Omran's proposal to be nonresponsive, id. at 30-32 ¶¶ b, i-j, and that the court enjoin defendant from finding Omran to be not responsible, id. at 30-31 ¶¶ b, g-h.

A brief review of relevant caselaw shows the remedies provided by courts reviewing claims like Omran's are like the remedies Omran actually requested in its complaint, and not like the resolicitation Omran urges in its opposition to defendant's

18

motion to dismiss.[12]  See, e.g., Sterlingwear of Bos., Inc. v. United States, 11 Cl. Ct. 879, 884-88 (1987) (vacating plaintiff's debarment, and remanding, after finding that the agency failed to comply with FAR 9.406 debarment procedures); Remington Arms Co., LLC v. United States, 126 Fed. Cl. 218, 230-33 (2016) (ordering the agency to perform a new responsibility decision, after finding that the agency's responsibility decision under FAR 9.104 was unsupported by the record); AmBuild Co., LLC v. United States, 119 Fed. Cl. 10, 23, 27 (2014) (ordering the agency's decision finding the protestor ineligible as a service-disabled veteran-owned small business (SDVOSB) to be set aside, and its status as an approved SDVOSB vendor reinstated in the relevant database, after finding the agency violated the protestor's due process rights in reaching its decision).

Omran has failed to show that the agency would be obligated to resolicit the contract, should it prevail on any of its claims.  Accordingly, plaintiff's position that the court must evaluate its standing by determining whether it would have a substantial chance in a resolicitation, as explained in Chenega Management, is incorrect.

D.     Whether Omran has Standing

Although this is a pre-award protest, Omran would show standing under the substantial chance test.  See Orion Tech., 704 F.3d at 1349; see also supra part II.B.  The agency's due date for proposals expired more than two weeks before Omran filed its complaint on December 23, 2015, thus the agency had received every proposal against which Omran would have competed, had its own proposal been evaluated.  See A9; La Rosa decl. ¶ 13.  Considering the information about the submitted proposals, see supra part I.B, it is possible to determine, under the substantial chance standard, whether Omran was prejudiced.

It is uncontested that Omran was an actual offeror.  See Def.'s Mot. 4.  The dispute is whether Omran can show it suffered prejudice from the agency's alleged errors.  See Myers Investigative, 275 F.3d at 1370.  To establish prejudice, Omran must show that it had a substantial chance to receive the contract award, but for the agency's alleged errors.  Info. Tech., 316 F.3d at 1319.

Although Omran did not argue that it had a substantial chance to receive this contract, see Pl.'s Opp'n 12, the court nonetheless considers this question.

---

[12]    In making this comparison, the court takes no position on whether Omran's claims would have been justiciable, if the court had reached the merits of those claims.

Assuming the agency had evaluated Omran's proposal, the best possible outcome would have been that it rated Omran acceptable on all three technical factors. See A40. If it found Omran to be technically acceptable, the agency would then have ranked Omran's proposal on its proposed price, along with the other technically acceptable responsive proposals. As none of Omran's allegations pertain either to the awardee's proposal, the solicitation, or the source selection process as a whole, Omran's success on any of its claims would not disturb the evaluations or ranking of the twenty-two responsive, technically-acceptable offerors. Thus, in a ranking on price, Omran would have ranked nineteenth out of twenty-three offerors. See La Rosa decl. ¶ 19; A123.

Establishing jurisdiction, including standing, is plaintiff's burden. Brandt, 710 F.3d at 1373. On these facts, it is impossible to find that plaintiff has carried its burden.

This was a lowest price technically acceptable procurement. A21. The agency awarded only one contract. A40. Ranking nineteenth out of twenty-three offerors, Omran would not have had a substantial chance to receive this contract. Accordingly, Omran lacks standing in its bid protest.

As Omran lacks standing, the court does not reach defendant's alternative argument that Omran's claims are nonjusticiable.

IV.   Conclusion

For the foregoing reasons, the court finds that plaintiff lacks standing to bring this bid protest. Defendant's motion to dismiss the complaint for lack of jurisdiction is **GRANTED**. Defendant's motion to dismiss the complaint for failure to state a claim upon which relief can be granted is **DENIED AS MOOT**. The Clerk of Court shall enter judgment accordingly. No costs.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge